RICHARD MISIORSKI *v.* DONNA M. MISIORSKI
(5644)

HULL, DALY and BIELUCH, Js.

Argued May 14—decision released July 7, 1987

*John H. Burns,* for the appellant (defendant).

*Edith F. McClure,* with whom, on the brief, was
*Gerald A. Roisman,* for the appellee (plaintiff).

HULL, J. The sole issue raised by the defendant in
this case is whether the court erred in the amount of
its award of permanent periodic alimony to the defend-
ant wife in a dissolution case. We conclude that "this
appeal presents one of the rare cases in which the trial
court abused its broad discretion by misapplying the
law and by making crucial findings which were not rea-

sonably supported by the facts." *McPhee* v. *McPhee,*
186 Conn. 167, 177, 440 A.2d 274 (1982), quoted in
*Ehrenkranz* v. *Ehrenkranz,* 2 Conn. App. 416, 420, 479
A.2d 826 (1984).

The facts found by the trial court, other than those
concerning financial orders, are not in dispute. The par-
ties are both forty-four years of age and have been mar-
ried for twenty-one years. They have a daughter twenty
years of age and a son seventeen years of age. The
plaintiff became involved with a younger woman in
1984 and left the marital home in May 1985. The plain-
tiff's association with the other person was a major fac-
tor in the breakdown of the marriage.

The plaintiff and George Willis were equal owners
of the stock of a successful corporation known as New
Technologies, Inc. The parties' financial condition has
been made more difficult by the foolish spending in
excess of $400,000 to construct a house. The plaintiff
has substantial debts primarily for amounts spent to
build their home. The nub of the memorandum of deci-
sion as it affects this appeal is found in the following:
"Considerable evidence was produced by the plaintiff
as to his finances. This was presented mainly through
a [certified public accountant] who is found to be a sub-
stantially reliable witness and worthy of belief.

*"The plaintiff will receive an estimated net salary
which, after deductions for taxes, will give him about
$1300 weekly. This will be the sum available to provide
for his family and his own living expenses.* The parties
estimate their living expense to a total beyond this sum.
As a result both of them will be obliged to retrench and
alter their lifestyles to a marked degree.

"With regard to alimony it is recognized that [the
defendant] is beset with a progressive disease, a form
of muscular dystrophy, which renders her somewhat
disabled now, and almost certainly ten years from now

this condition may ultimately result in invalidism. As a consequence, it would seem unsuitable to terminate the alimony payments at a future date.

"The accounting concerning the plaintiff's firm is complicated, and the amounts available for payment of his obligations to his wife are not readily discernible. They may be somewhat greater than appears. However, the plaintiff's accountant's figures are to some degree adopted by the court. It is noteworthy, too, that the defendant's accountant did not greatly dispute his testimony." (Emphasis added.)

The court dissolved the marriage and entered the following orders pertinent to our inquiry: (1) the marital home is to be sold with 25 percent of the net proceeds going to the plaintiff and 75 percent going to the defendant; (2) the plaintiff is to pay to the defendant $100 weekly for the support of the minor son; (3) the plaintiff is to pay to the defendant weekly alimony in the sum of $500 terminable upon the death of either party or upon remarriage by the defendant; and (4) the financial orders are to be effective only when the proceeds of the sale of the home have been received. Pendente lite orders for support and alimony, then in effect, were continued until the receipt of those proceeds. In response to the defendant's request for an articulation, the court filed a further memorandum of decision in which it concluded (1) that the family house was worth approximately $440,000, (2) that the defendant had no workable skills and a limited earning capacity, and (3) that the basis for excluding from the plaintiff's income certain items shown on page four of the plaintiff's financial affidavit was that those were advances made by the company on behalf of the plaintiff and were not monies that would be available to him.

The defendant on appeal poses the single issue: "Did the court err in concluding that the plaintiff's gross

income was $2175 per week and his net income was in the sum of approximately $1300 per week where it failed to credit income of $471 per week and debited taxes on $58,787 of annual income in order to arrive at the $1300 weekly figure?" We consider this claim of error, although it narrowly focuses in on specific conclusions of the court, to sufficiently alert the plaintiff to allow this court to consider the criteria for review set forth above in *McPhee* and *Ehrenkranz,* supra.

This case was tried and decided upon the plaintiff's income for the 1986 calendar year. The plaintiff's 1986 tax computation contained in note 1 of his affidavit shows 1986 taxable income of $162,867.52. The plaintiff earned wages from his company in those years prior to the dissolution of the marriage as follows: (1) 1985 - $146,265; (2) 1984 - $160,330; and (3) 1983 - $124,288. The plaintiff's affidavit showed gross wages on August 6, 1986, of $2175 per week from his chief employment and net wages of $1266.07 after tax withholding. The affidavit also showed $38.46 per week consulting income for a total of $1304.53 a week. It is this latter figure which the court accepted and on which it based its alimony award. "And thereby hangs a tale."[1]

That figure is based principally on note 1 to the financial affidavit entitled "1986 tax computation."[2] Steven

[1] See W. Shakespeare, The Taming of the Shrew, Act IV, Scene V, l. 60.

[2]

NOTES TO FINANCIAL AFFIDAVIT

NOTE 1: SECTION I - INCOME, A - INCOME FROM PRINCIPLE EMPLOYMENT

1986 TAX COMPUTATION

INCOME:

| | |
|---|---|
| Income earned to date: | $54154.52 |
| Estimate income from July to December (4350.00 for 24 weeks) | 52200.00 |
| 1985 Rollover (Amount was received in April 1985 to pay 1984 individual income taxes). | 23000.00 |

C. Mercadante, the plaintiff's certified public accountant, who managed the plaintiff's and the corporation's finances and tax matters, explained this note. In the years of rising income from this business the plaintiff and Willis both borrowed money from their wholly controlled corporation and deferred the payment of the

|  |  |  |  |
|---|---|---|---|
| 1986 Rollover (Amount was received in April 1986 to pay 1985 individual income taxes). |  | 6000.00 |  |
| 1985 Personal line-of-credit used in lieu of wages in 1985 (This amount will be paid off by New Technologies, Inc. during 1986 in the form of wages.) |  |  |  |
| Date received: October 9, 1985 |  | 6033.00 |  |
| November 11, 1985 |  | 11000.00 |  |
| January 2, 1986: |  | 7500.00 | 162867.52 |
| OTHER INCOME: |  |  |  |
| Concept Services, Inc. |  |  | 2000.00 |
| Gain on sale of recreational vehicle |  |  | 6900.00 |
| BUSINESS INCOME (LOSS): |  |  |  |
| Recreational vehicle |  | (4000.00) |  |
| Condominium–Nashua, New Hampshire |  | (3000.00) |  |
| 1845 Shopes Limited Partnership |  | (3600.00) | (10600.00) |
| OTHER EXPENSES: |  |  |  |
| Deductible family support (Estimated at $25000.00 @ ½ year) |  |  | (12500.00) |
| ITEMIZED DEDUCTIONS: |  |  |  |
| Taxes: State | 27.00 |  |  |
| Real estate | 4500.00 |  |  |
| Sales tax | 650.00 |  |  |
| Personal property | 1000.00 |  |  |
| Interest expense: |  |  |  |
| Mortgage–Avon | 22000.00 |  |  |
| Mortgage–Suffield | 4800.00 |  |  |
| Other | 1500.00 |  |  |
| Contributions | 1000.00 | 35477.00 |  |
| LESS: Zero bracket amount (single) |  | (2390.00) | (33087.00) |
| EXEMPTIONS: |  |  | (1040.00) |
| TAXABLE INCOME: |  |  | $114560.52 |
| TAX: |  |  | $ 44261.26 |
| FEDERAL INCOME TAX PER WEEK: (44251.26/52 weeks) |  |  | $ 851.18 |

income tax on such sums until the following year. The sums borrowed were used primarily for the construction of their respective homes. The $23,000 and $6000 rollovers shown represent such transactions. To allow such items to be deducted in the granting of permanent alimony is to let the tax tail wag the dog of the obligated party's ability to pay. We note concerning these "rollover items" that the advances for which they are now being considered taxable went largely into the parties' residence. The 1986 tax computation provides for the payment of taxes on these amounts. Yet a careful examination of the record shows no legal necessity that these amounts be paid to the Internal Revenue Service in 1986. It is clear from Mercadante's testimony that such a plan of payments is desirable only from the plaintiff's tax-planning standpoint.

We note further that the plaintiff's Schedule A on his affidavit lists debts totalling $84,430 with weekly payments of $902.24. Yet four items on the debt schedule are assumed in the tax computation to have been paid: the 1986 rollover amount of $6000 due to New Technologies, Inc. and the three bank notes of $6033, $11,000, and $7500, shown on the tax computation as a 1985 personal line of credit. Finally, eliminating these four items totalling $30,533 from the claimed debt of $84,430 leaves a debt of $53,897. Since the parties' house was valued by the court at $440,000 and the mortgage was approximately $189,000, the equity was $251,000. The plaintiff's 25 percent share of this, less customary expenses, is somewhat less than $63,000. This amount, which was created by the money put into the house through the tax deferral plan, is sufficient to reduce substantially the plaintiff's indebtedness. Our comments reveal the dangers inherent in the court's evident reliance on the accountant's testimony as to the plaintiff's financial situation.

Before reaching the determinant factor in the court's conclusions, we must also comment on certain statements in the memorandum of decision. The court's reliance on Mercadante's testimony is not unequivocal. The court states the following, all of which cast doubt on its ultimate conclusion: (1) the amounts available for payment of his obligations to his wife are not readily discernible; (2) they may be somewhat greater than appears; and (3) the plaintiff's accountant's figures are *to some degree* adopted by the court. The court noted also that the defendant's accountant did not greatly dispute his testimony. (Emphasis added.) The latter observation does not strengthen the court's conclusions, for it is not the truth of the accountant's testimony that is in question, but the use of it in computing the obligor's earning capacity or ability to pay.

It is not clear whether or not the court followed the appropriate standard in setting alimony in this case. It is hornbook law that what a spouse can afford to pay for support and alimony is a material consideration in the court's determination as to what is a proper order. *Casanova* v. *Casanova,* 166 Conn. 304, 304–305, 348 A.2d 668 (1974); *England* v. *England,* 138 Conn. 410, 85 A.2d 483 (1951). The same standard applies to the "sources of income" in General Statutes § 46b-82 on which the court relied. This must be taken to mean income reasonably available to the supporting paying spouse. The ultimate inquiry is the obligor's earning capacity. See *Schmidt* v. *Schmidt,* 180 Conn. 184, 189–90, 429 A.2d 470 (1980). To allow this factor to be skewed by the manner in which the obligor desires, for tax or other reasons, to handle his income in a given year, is to undermine the awarding of sound and just financial orders in dissolution cases.

It is clear from the record that such an event occurred in this case. In its memorandum of decision, the court made the key finding that "the plaintiff will receive an

estimated net salary which, after deductions for taxes, will give him about $1300 weekly. This will be the sum available to provide for his family and his own living expenses." The evidential underpinnings for such a conclusion are woefully inadequate. To reach such a conclusion, the court evidently relied on page one of the plaintiff's affidavit which shows tax withholdings of $851 per week. We have already demonstrated the irrelevancy of this computation because the amount of money claimed to be available to him was based on tax planning payments and not on the availability of income to meet his obligations if he so desired.

We consider it significant that the sum of $851.18 shown as withholding on page one of the plaintiff's affidavit is achieved exactly by dividing the tax figure at the bottom of the 1986 tax computation in the amount of $44,261.26 by 52 weeks. Thus, the claimed withholding tax of $851 per week is based upon the 1986 tax computation which we have pointed out provides arbitrarily for the payment of income tax on two rollovers. It also provides for the discharge of the plaintiff's three notes. Therefore, to the very clear extent that the 1986 tax computation presents a distorted and unrealistic picture of the plaintiff's earning capacity, this presentation of the plaintiff's claimed financial stance, as far as alimony is concerned, permeates the plaintiff's entire affidavit.

Any possible doubt about the insufficiency of the evidentiary basis of a conclusion based on the appropriate standard vanishes in view of the court's conclusion concerning the three bank notes paid off on the plaintiff's behalf by New Technologies, Inc. The court stated in its supplementary memorandum of decision that it did not consider these items in assessing the plaintiff's weekly net income since "these are not monies that will be available to him." The undisputed evidence of Mercadante is to the contrary. These sums

were not available to the plaintiff if he chose to follow his tax accountant's recommendations. A portion of the cross-examination of Mercadante reveals the following:

"Q. OK. Now, you are projecting in this corporate year that the company is going to give him the $25,000.00 to pay off the bank. Right?

"A. Yes.

"Q. Now isn't he going to pay taxes on that $25,000 that he's getting from the . . . from the company?

"A. The way its structured he's going to receive the $25,000, or whatever the amount is, as a reduction of that debt and being included as income, but no taxes are going to be withheld out of that $25,000.

"Q. Well, they're not going to be withheld, but aren't they going to be paid?

"A. Yes.

"Q. Then I—isn't that payment incorporated into your 44,000-dollar figure?

"A. Yes.

"Q. That's what I asked you. OK. So if he chooses not to pay the bank the $25,000.

"A. Mmm hum. Yes.

"Q. He can keep the entire $25,000 for his family and household uses and the tax is already addressed in this . . . in this projection. Correct?

"A. Yes.

There is also found in the direct examination of Mercadante the following illuminating testimony concerning the payment by New Technologies, Inc. of the three bank notes.

"Q. From a cash-flow standpoint, does it make any sense whatsoever to you to have Mr. Misiorski take this $25,000 and use it for other purposes other than to pay back this debt?

"A. No.

\* \* \*

"Q. So this money isn't available presently for Mr. Misiorski to draw from the business to have other monies for himself, his wife, his children, or any other personal reason, is it?

"A. The money is available, but it would make no sense whatsoever to take it for other personal reasons instead of paying off the loans. . . .

"Q. OK.

"A. . . . . . because you're never going to be ahead of the game.

"Q. And that's the $25,000 we're talking about for the personal line of credit.

"A. Yes."

The trial court abused its broad discretion by misapplying the law and by making crucial findings which were not reasonably supported by the record. "The underpinning of the decision is not sound." *Ehrenkranz v. Ehrenkranz,* 2 Conn. App. 416, 423, 479 A.2d 826 (1984).

There is error, the judgment is set aside as the award of alimony and the case is remanded for further proceedings limited to the question of the appropriate amount of periodic alimony to be awarded to the defendant.

In this opinion the other judges concurred.