[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff herein has brought this action seeking a dissolution of the marriage to the defendant on the grounds of irretrievable breakdown. The complaint is dated March 13, 1987.
The couple were married on December 9, 1979, in Colchester. They have one child, Lisa, born September 22, 1983. At the time of the marriage the plaintiff was an attorney admitted in Connecticut, and employed in the legal department of the Hartford Group. The defendant owned and operated a new car dealership in Colchester and thereafter acquired a second car dealership in Colchester. When the child was born, the plaintiff quit her full-time job but worked part-time for a period of time thereafter. The marriage was the first for the plaintiff, and the second for the defendant. He has an adult daughter from his first marriage.
The parties knew each other for about five years prior to the marriage. After the marriage, they lived in a dwelling in CT Page 7526 Colchester, which had a swimming pool. They had a maid and lawn care was provided. The plaintiff retained all of her salary, which was $38,000 at the time, in addition to funds provided by the defendant.
The parties had a few altercations from time to time from the date of marriage to the filing of the complaint. A few days after the marriage, the plaintiff made an unflattering remark to the defendant about his daughter, and the defendant slapped the plaintiff on the shoulder. The plaintiff recounts several other incidents including the defendant's tearing of a sweatshirt worn by the plaintiff and calling her names in public on a few occasions. The defendant complained that the plaintiff had a "Jekyll-and-Hyde" personality; that she was moody, depressed and disagreeable and precipitated the events she complained of. The plaintiff further complained that the defendant was seeing other women during the marriage, and that he gambled extensively, but offered no conclusive evidence on either ground. As to the same period, the defendant complained that the house was cluttered, and, especially after the arrival of the child, the plaintiff would not have dinner ready for him. He also complained about her reckless spending, which ultimately led to the destruction of her credit cards.
In all candor, the court cannot find that the marriage had broken down irretrievably at the time of the filing of the complaint. Indeed, reconciliation was still being attempted long after the suit was brought. See Eversman v. Eversman, 4 Conn. App. 611,613-614; citing Joy v. Joy, 178 Conn. 254, 255-256. The evidence does not convince the court that their differences as of the time of suit could not have been resolved.
Such a finding will not prevent the court from proceeding to determine whether, as of the time of the hearing, an irretrievable breakdown has occurred since this court is exercising equitable powers in this matter. See, e.g., Kelsall v. Kelsall, 139 Conn. 163.
This suit was commenced March 13, 1987. The file indicates that, although numerous motions were filed on behalf of the plaintiff by the several attorneys representing the plaintiff, nothing really happened to cause the case to proceed until July 18, 1988, when the plaintiff filed a motion for an ex-parte restraining order alleging that the plaintiff believed the defendant was sexually molesting their daughter and asking that his visitation rights be terminated. Such order was granted, ex parte, on July 18, 1988 (Flanagan, J.) (#118).
There appears to be no particular event that precipitated the filing of the divorce papers. Commencing about CT Page 7527 six months prior to filing, the plaintiff would decline to have dinner with the defendant when he came home, preferring to spend the evening home with the child.
During this period of time, the plaintiff was consulting with Ms. Holly Hatch as to her emotional problem. Ms. Hatch a background as a social worker, and practiced in Colchester. In the middle of August, 1986, Ms. Hatch received a call from the plaintiff that Lisa told her that the plaintiff's mother had stuck something into her rearend. Ms. Hatch reported the matter to the Department of Children and Youth Services. This conversation followed a conversation a week earlier, when the plaintiff called Ms. Hatch about the matter of reporting child abuse.
On September 8, 1986, the plaintiff took the child to see Dr. Jamby Marvasti, a child psychiatrist in Manchester. She obtained his name from the sexual abuse hotline. The complaint of the plaintiff to Dr. Marvasti was that Lisa was afraid of her father because he hit her. She further related problems in the marriage, but didn't want the "state" to be involved. At the time, the plaintiff also told the doctor that Lisa had told her that other persons touched her, including a clown, a dog, her grandmother, three babysitters, and the defendant. Dr. Marvasti further testified that the plaintiff was unwilling to allow him to interview the child alone. He saw the child two times thereafter. The last time, he videotaped the interview to assure the plaintiff of the child's safety with him. This was in February 2, 1987. He further testified that he did not complete his evaluation, but referred the plaintiff to the Manchester Child Guidance Clinic.
At about the same time, Lisa was experiencing a series of stomach aches and was taken to see her pediatrician, Peter L. Hine, M.D. On September 13, 1986, Dr. Hine performed a rectal examination of Lisa as part of his diagnostic evaluation. He referred the child to a pediatric gastroenterologist at Hartford Hospital, Allen M. Leichtner, M.D. Dr. Leichter reported to Dr. Hine that he had also performed a rectal examination on September 26, 1986.
On February 4, 1987, the plaintiff took the child to Donald J. Heibel, a clinical psychologist in Glastonbury. She obtained his name from a nurse. He testified in court on August 8, 1990, that up to that time he had seen Lisa for ninety sessions. At the initial interview, Lisa complained that someone had touched her bottom and referred to her grandmother, a clown, another doctor, her father and others. Curiously, Dr. Heibel testified that in the early interviews, he became aware of the marital problems, and concluded that his treatment of the child would involve his helping the plaintiff to get out of the marriage, as this would help the mother handle Lisa. CT Page 7528
On cross-examination, he identified the areas of concern to him as being:
1. the alleged sexual abuse;
2. getting along with children at school;
3. the child's temperamental nature;
4. lack of discipline at home;
 5. dealing with her grandmother's tendency to be over-indulgent.
He testified that the child, at the early interview, had delayed cognitive skills and noted that the refusal of the mother to "let go" of the child emotionally was probably a continuing factor. He further noted the child, at this time, was manipulative of her mother and played upon her for sympathy.
On May 17, 1987, Dr. Heibel inquired of Dr. Marvasti as to his findings concerning Lisa. Dr. Marvasti responded that he could form no opinion because he was unable to complete his evaluation.
From the witness's testimony, he saw Lisa weekly during the first three months and bi-weekly thereafter.
During the months following the filing for divorce, the couple continued to live together and reconciliations were attempted. As previously noted, the defendant claimed that the plaintiff during this time was non-supportive, that she remained in her bedroom with Lisa when he came home; and refused to have dinner with him. The defendant testified that the plaintiff accused him, in August of 1987, of molesting the child, which he felt was the end of hope of reconciliation. A month later, he moved into a separate bedroom, and, in June of 1988, he moved out to his present address.
Likewise, in June, 1988, the plaintiff told Dr. Heible that Lisa had told her that the defendant "due her bottom." Although Dr. Heible had testified that, in his early days with Lisa, he had serious doubts that any improper touching had occurred, he requested his associate, Gregory D. Hanson, to conduct an evaluation as to whether Lisa had been sexually abused, based upon her complaint that someone had dug her bottom. Dr. Hanson interviewed the child in the presence of Dr. Heible, then alone, and then with the plaintiff being present. He testified that the service being performed was in a limited consultative CT Page 7529 role. He testified that he didn't want to interview the defendant because he was not doing a comprehensive evaluation which would have involved the accused person. He was of the opinion that there was information suggestive of sexual abuse by the defendant. He has not seen the child since. On July 13, 1988, Dr. Heible sent a letter to counsel for the plaintiff, referring to Dr. Hanson's "evaluation," and his conclusion that the child was being inappropriately touched by the defendant (Exhibit B). Counsel for the plaintiff filed his ex parte order on July 18, 1988.
On August 1, 1988, the court (Flanagan, J.) appointed Robert Meier as a qualified psychologist to perform a psychological evaluation of the parties and the child. He filed a report therein (Child's Ex. I), dated February 7, 1990. His evaluation was requested to provide recommendations regarding custody and visitation. He conducted tests and interviews with the parties and the child. In his opinion, "conclusions regarding possible sexual abuse and physical abuse are unclear." Cf. Ex. I, pp. 13-14. On cross-examination, he stated that the indicators are that there was no sexual abuse.
The court also heard testimony from Lawrence Guibeault, a detective with the Connecticut State Police. He testified that in 1988 he administered a polygraph test to the defendant, after an investigation by the Department of Children and Youth Services (DCYS), originating from a complaint by the plaintiff to Dr. Heible. He was of the opinion that the defendant was telling the truth in denying the charges of sexual abuse and closed out the investigation.
Having heard the testimony of the various expert witnesses and therapists relating to the claims of sexual abuse of Lisa, the court finds no credible evidence to support any claim of such conduct by the father.
 "The trier of fact was entitled to evaluate the conflicting evidence. It was entitled to consider the basis of the testimony of the expert witness. In so doing it might weigh, as it saw fit, his expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them."
State v. Perez, 182 Conn. 603, 610.
Under the foregoing rubric, a discussion of the testimony of the various professionals is appropriate. CT Page 7530
As to Dr. Marvasti, it appears to the court that he is a competent psychiatrist, experienced in treating and evaluating children. He could arrive at no conclusion of any probative value because the plaintiff's interference with his diagnostic procedures prevented him from a proper evaluation as to whether any abuse occurred.
Dr. Heible testified as the child's therapist, and identified the claim of sexual abuse as one of a number of problem areas for the child. He had a limited background in the field of sexual abuse of children, having attended one workshop and read several articles on the subject. Since he was aware of the divorce proceedings, his findings on the claim of sexual abuse are subject to bias, as he testified that he thought he should help the plaintiff get out of her marriage as a means of assisting the child, his patient. He apparently took no medical history of the child, especially as to whether the child had had any recent rectal examinations. As noted supra, the child was examined rectally by two pediatricians a few months prior. He was cross-examined extensively by defense counsel who was utilizing the text of "The Parental Aberration Syndrome and the Differentiation Between Fabricated and Genuine Child Sex Abuse," Richard A. Gardner, M.D. (1987) (Ex. I). He disagreed with the use of many of the factors identified by Dr. Gardner as pertinent to the determination of real or fabricated sexual abuse, on the basis that such techniques were applicable to evaluation and not therapy. However, he did agree with the author's premise that the disregard of guiltiness on the part of the child is the hallmark of fabrication, and testified that the child showed no evidence of guilt in the interviews. In fact, in the spring of 1987, he found no conclusive evidence of any sexual abuse. His testimony provides no support for any claim of sexual abuse by the defendant.
With the foregoing in mind, the court finds it difficult to understand why Dr. Heible should undertake to consult with his associate, Dr. Hanson, almost eighteen months after he started therapy and even longer after the date of the alleged incident.
The examination of the child by Dr. Hanson as to the claim of sexual abuse likewise provides no credible evidence. Although he had a stronger background in the area, he testified that his examination was in a limited consultative role; and not an evaluation of the child for such complaint. He testified that a complete consultative evaluation would require the involvement of both parents, which did not occur. He further testified that he was unaware that the child implicated others. Nor was he aware of the rectal examinations. His opinion was not as to the probability that the defendant had molested the child but that there was some apparent information suggestive of sexual abuse by CT Page 7531 the plaintiff. Even if the opinion were properly stated, it has no probative value because of the lack of thoroughness in its preparation.
Dr. Meier was appointed by the court to conduct an evaluation of the child and interviewed all three persons. While the purpose of the evaluation was to elicit recommendations as to custody and visitation, he was examined by counsel as to his findings in support of his recommendation. Asked as to his opinion as to whether the child had been sexually abused, he testified that he couldn't say that she had. He further testified that in his opinion the defendant did not fit the pattern of a child abuser. He also cited a series of factors he found that negated the existence of sexual abuse; e.g., whether the child spoke freely in the presence of the accused; whether details were freely offered; and whether the child seemed non-defensive; i.e., free of guilt. His testimony indicated the presence of those negative factors in the charge of sexual abuse.
The court finds that the plaintiff has failed to prove that the defendant has committed any act of sexual abuse of the child. See Mallory v. Mallory, 207 Conn. 48, 53.
The court does find that the marriage of the parties has broken down irretrievably, and that there is no hope of any reconciliation, and a decree of dissolution may enter on such ground. The defendant claims that he realized the marriage could not be saved in August 1987, when the plaintiff accused him of sexually molesting the child. He also cited her "Jekyll-and-Hyde" personality; i.e., that she could be a warm and loving wife and mother at times, but at other times, she would have a vicious temper that had alienated all of his friends from their company.
The plaintiff claims that the breakdown was caused by the sexual abuse of the child by the defendant and his mental abuse of her by the defendant. This last had to do with several instances where he called her names in public. She also claims the breakdown occurred when she learned the defendant fathered a child in June 1990.
It should be noted that the parties have continued to have sexual relations to the date of the hearing, and each has had an affair since the bringing of the complaint.
 I
Custody and Visitation
The plaintiff is seeking custody of the child. The defendant has admitted that his business responsibilities will CT Page 7532 preclude him from being an appropriate custodial parent. An order may enter granting custody of the child to the plaintiff, as being in the best interest of the child.
In the matter of visitation, the court notes that the child was represented throughout these proceedings. Further, the issue of custody and visitation was referred to Dr. Meier for a report.
In his brief, the attorney for the child made the following recommendations on visitation:
a. one weekday night per week and one weekend day per week;
b. visitations to be supervised by a licensed professional who can appropriately monitor visitation and address any problems.
These are in accord with the recommendation of Dr. Meier who expressly notes:
"Visitation should be under supervised conditions primarily for the protection of the child if in fact abuse did occur, and, secondly, to avoid any further accusations of inappropriate behavior on the part of Mr. Collins." (It will bear repeating that all claims by the plaintiff of improper sexual activity on the part of the defendant toward the child have been adjudicated.)
As to the matter of supervision, Dr. Meier recommended three professionals for such project: Dr. Monahan, of Woodstock; Dr. Pedros, of Norwich; and Dr. McIntyre of Old Lyme. He also noted that his reasoning in suggesting a professional for such purpose was not only to provide supervision but also to monitor and assess the relationship and make recommendations as to whether visitation should be expanded or modified.
This court is empowered to continue the appointment of counsel for a minor child who may be heard on matters pertaining to the interests of such child. Section 46b-54, C.G.S. See Weinstein v. Weinstein, 18 Conn. App. 622, 627-629; Skubas v. Skubas, 31 Conn. Sup. 340. Attorney Blanchard is therefore appointed by the court to serve as attorney for the child until further order of this court.
Having carefully considered the proposals of the child's attorney, and the underlying rationale therefor, this court is of the opinion that it sees no need for the supervision of visitation as recommended. Since the court found no probative evidence of CT Page 7533 abuse of the child by the defendant, the only reason for such supervision would be to forestall future charges by the plaintiff. After the exhaustive evidence offered to the court on this issue, with no evidence probative of the issue, the court is of the opinion that normal visitation between the defendant and the child would be in the best interest of the child, and that the presence of a third party "supervisor" would be an inhibiting factor, and detrimental to such parent-child relationship. Accordingly, the court orders visitation as so recommended but without the supervision. Off premises visitation for the defendant is ordered as follows:
(a) Tuesday evening from 5 p. m. to 9 p. m.
(b) Sunday from noon to 7 p. m.
In order to provide the court with a continuing assessment of the father-child relationship, the court appoints the aforesaid Robert Meier to conduct evaluations of such relationship and to make recommendations to the court as to any proposed modifications thereof. Such evaluations shall be not less than monthly, from date hereof, and continuing thereafter until further order of this court. Counsel for the child shall arrange the appointments therefor, and shall transport the child to and from Dr. Meier's office.
All expenses and fees incurred in this process, as approved by the court, shall be borne by the defendant.
The defendant may seek a modification of visitation any time after two months from the commencement of visitation.
The foregoing grant of custody is conditioned upon the child continuing the counseling she had been undergoing. The attorney for the child may request the court to review the status of such counseling at such times as he shall deem appropriate and shall request such a review not later than six months from the date hereof.
 II
Financial Orders
The court has also reviewed the statutes pertinent to the award of alimony, support and division of property and has considered the factors set forth therein.
Sections 46b-81 and 46b-82 of the General Statutes provide for the assignment of property to either spouse and for the payment of alimony, and require the court to consider certain CT Page 7534 factors set forth therein.
As noted supra, the couple have been married for eleven and one-half years. They have been separated for some three years. The court finds that fault for the dissolution lies with the plaintiff.
The plaintiff is now forty years old. She has been admitted to the Connecticut Bar and worked full time in the legal department of an insurance company, until the birth of her Child, at an annual salary of $38,000. After the birth, she returned to work on a part-time basis, earning $20.00 per hour. During her married life, the plaintiff has consulted a number of professionals, including physicians, psychiatrists, psychologists and therapists. In her testimony, she claimed to suffer from chronic fatigue, which, with her child-rearing activities, has prevented her from seeking re-employment since 1985.
She offered the testimony of Peter Maru, M.D., who identified himself as a specialist in chronic fatigue and the founder of a clinic to address this malady. He testified that he first examined the plaintiff in May of 1989 and subsequently diagnosed her as suffering from the chronic fatigue syndrome, which he defined as a condition of unknown cause whose chief symptom is a debilitating weakness with no improvement after bed rest. The syndrome also involves psychiatric factors; in this case, a major depression. He also described the various drugs he prescribed to treat her complaints. These included anti-depressants, analgesics, antibiotics and Zantac for stomach irritations. He last saw the plaintiff in January of 1991. His opinion was that she was not able to resume her employment because the syndrome interfered with her thought processes.
On this issue, the defendant offered the testimony of Fernando Stern, M.D., a board-certified psychiatrist, who offered opinion testimony as to whether the plaintiff was disabled from resuming her employment. He examined the plaintiff on November 7, 1989, for such purpose, as well as for her ability to care for the child. He testified as to his experience in cases involving claims of disability, including work for the Social Security Administration and the Department of Corrections. He diagnosed the plaintiff as suffering from an underlying depression as a result of a borderline personality disorder. He noted that the resulting symptoms were similar to those attributed to the chronic fatigue syndrome. He was of the opinion that the symptoms described by the plaintiff were not sufficient to prevent her from being gainfully employed according to her level of education and training, and that there was nothing to limit her resuming her employment as an attorney. He further noted that treatment for the plaintiff's condition was available and recommended the use CT Page 7535 of a single, sophisticated psychiatrist who could provide both psychotherapy as well as prescriptive drugs.
On this issue, the court notes that Dr. Maru was offered only as a witness to the physical condition of the plaintiff and not for the purpose of determining her ability (or disability) to perform the duties of her former employment. Nor did he testify to any experience in such area, as did Dr. Stern. Having considered the testimony of both witnesses, the court finds that the plaintiff is able to resume her former employment at least on a part-time basis while the child is in school.
 II
The defendant is now fifty-four years of age and is in good health. He is the owner and manager of two automobile dealerships in Colchester known as Hilltop Motors, Inc., and Jack's Chevrolet-Oldsmobile-Pontiac, Inc. The defendant owns the real estate — land and buildings — where each dealership is located, which real estate is leased to the respective dealership. The defendant is the sole stockholder in each dealership corporation. The Hilltop rent is $625 per month. The rent to Jack's is $3,000 per month, which is equal to the principal and interest on two notes of the defendant, payable to Connecticut National Bank. Both corporations are qualified as Subchapter S corporations for income tax purposes.
The court received extensive testimony from Hyman Shepatin, a certified public accountant in New London, who has handled the accounting matters for the defendant for 25 years and whom the court finds to be a reliable witness.
Mr. Shepatin related a history of both dealerships and the changes in the financial pictures of each. He also described the procedures used by the defendant in drawing funds for personal use from each business. Such testimony is useful in determining such matters as net income and ability to pay when considering financial orders under the aforesaid statutes. "Net income". . . "would ordinarily consist of the total income received by the defendant from all sources, less the legitimate expenses of realizing it . . ." Sturtevant v. Sturtevant, 146 Conn. 644, 648. See Collette v. Collette, 127 Conn. 465, 469; Bronson v. Bronson,1 Conn. App. 337-340.
"In appropriate circumstances, the trial court may base its financial orders on earning capacity rather than on actual earned income (citations omitted). The ultimate inquiry in determining the income reasonably available to the supporting paying spouse is the earning capacity of the supporting paying spouse." Broderick v. Broderick, 20 Conn. App. 145, 147, citing CT Page 7536 Misiorski v. Misiorski, 11 Conn. App. 463, 469.
In this respect, it is clear that the sole source of income of the defendant is the profits from his dealerships. The defendant offered a statement from Mr. Shepatin (Ex. 8) detailing the flow of funds from the dealerships to the defendant.
The defendant draws a weekly salary from Hilltop in the amount of $200, less FICA and withholding. He also draws additional cash and pays personal expenses from Hilltop funds which items are charged to his "officer loan account." The total of the two — salary and draw — is reported as his income to the I.R.S. In each of the fiscal years ending July 31, 1989 and 1990, his gross salary was $50,400. His net, after taxes and FICA, was $35,629 in FY 1989 and $34,615 in FY 1990.
The draw from Jack's is similar to that with Hilltop, except that the defendant draws no salary. The financial picture with Jack's is different in that in 1986 and 1987, the defendant spent substantial sums improving and enlarging the dealership. One source of these funds was a loan from Hilltop to the defendant in the amount of $150,000. Further funds were obtained from Connecticut National Bank and GMAC. The loans were guaranteed by the defendant. Payments were made by the corporation and charged to the defendant's officer's account: Jack's provided further funds from its operations, which created a debt to it from the defendant.
In FY 1989, the defendant drew a net (after taxes) income from Jack's in the amount of $23,796, which was applied against his debt to Jack's, which was then $402,824. This debt due to further payments for renovations increased as of July 31, 1990 to $443,525. At the time, he drew a net (after tax) amount of $38,450 for personal expenses.
From these funds the defendant has been paying pendente lite the sum of $500 per week in alimony plus the expense of shelter, education, and professional assistance of $25,000 per year.
The ability to continue to make these or similar payments will, of course, depend on the health of the dealerships which in turn does, and will, depend on certain economic factors, including the economy in general and the health of the automotive industry.
In order to provide guidance to the court in preparing financial orders, the parties engaged appraisers to evaluate the family dwelling and the business properties. At a hearing before the undersigned, the parties entered into a stipulation as follows: CT Page 7537
That the fair market value of the following properties as of May 2, 1990, was as follows:
 1. Single-family dwelling at 39 Jaffe Terrace in Colchester-jointly owned $ 234,000.00
 2. Business real estate at 120 South Main Street (Jack's Chevrolet, Oldsmobile, Pontiac, Inc.-lessee) $1,400,000.00
 3. Business real estate at 435 South Main Street (Hilltop Motors, Inc. lessee) $ 930,000.00
 4. Business known as Jack's Chevrolet Oldsmobile, Pontiac, Inc. $ 317,500.00
 5. Business known as Hilltop Motors, Inc. $ 492,500.00
The data used to develop the values of the commercial properties were prepared in the fall of 1989. It is the function of the court to determine these values as of the date of the decree. See Sunbury v. Sunbury, 216 Conn. 673, 676; holding that the date of the decree is the date to determine property values for the purpose of division of property.
In fixing value, our Supreme Court has noted, "The `fair market value' is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. . ." Mazzola v. Commissioner of Transportation, 175 Conn. 576,582. The trier must give due consideration to everything by which value is legitimately affected. Holley v. Torrington, 63 Conn. 426,433. He must take into account those factors which a willing buyer and a willing seller would consider in fairly negotiating an agreement. Budney v. Ives, 156 Conn. 83, 88.
In attempting to arrive at current values, the court notes that the defendant filed a financial affidavit on March 26, 1990. Therein the real estate at Hilltop is valued at $816,000 with a mortgage of $75,223 for a net equity of $740,777. The real estate at Jack's is valued at $1,190,000, with a mortgage of $906,724 for a net equity of $283,276. A note thereto states that the values are based upon July 31, 1989 estimates and that the values may be overstated due to deterioration in the auto business.
The values of the business are set out as $429,896 for Hilltop and $296,432 for Jack's. CT Page 7538
For FY 1989, Hilltop reported a loss of $50,490 while Jack's reported a profit of $49,044.
A comparison of the two estimates of value indicates a total under estimate in the financial statement in the range of 13 percent.
The court takes judicial notice of the following factors: the announcement by the administration that the country is in a recession, the low level of activity in the automobile business as indicated by the announcement of heavy losses by the manufacturers; the decline of economic activity in eastern Connecticut and the precarious position of the banking industry in Connecticut, with the concomitant lack of availability of credit for business purposes.
The deterioration of the defendant's businesses was testified to by Mr. Shepatin on the issue of working capital, which he defined as the ratio of current assets to current liabilities. He testified that from his experience, the proper ratio is not less than 2:1. He further testified that neither business met this standard. Jack's had a ratio of 1:1 and Hilltop had an actual deficit in working capital. The effect of this situation is to make it very difficult to run the businesses, because suppliers must be paid. Obviously, the defendant's personal income is limited thereby, according to the witness.
He further estimated that as of July 31, 1990, the working capital shortage at Hilltop was $2.5 million. He also stated that Hilltop was "out of trust" to Chrysler in that it owed Chrysler for cars that had been sold; and that Jack's was not "out of trust" because General Motors would not allow it. Hilltop had a longer history with Chrysler and was accorded some leniency.
The financial affidavit filed by the defendant of February 27, 1991, shows losses in both dealerships for the fiscal years ending July 31, 1990, totaling $51,600.
It should also be noted that Hilltop was acquired by the defendant prior to the marriage and the court finds the book value of the business at the time of the marriage to be $175,000. Jack's was acquired subsequent to the marriage. According to Mr. Shepatin, book value may be the net worth of the business and may be used as a guide to market value.
In considering the allocation of the business properties, the court first notes that no realistic market exists for the sale of either dealership. Nationwide, cars are not selling, and it would not be realistic to expect many buyers for CT Page 7539 car dealerships. Further, because of the stipulation as to values, the court has no basis for determining that the highest and best use of the real estate is its present use; i.e., as an automobile dealership. Having no basis to consider any lease arrangement, the court must assume that the dealership, if sold at all, must be sold with the real estate, thereby further diminishing the supply of potential buyers. The court has also considered any non-monetary contributions by the plaintiff to either or both enterprises; O'Neill v. O'Neill, 13 Conn. App. 300,307-312. In this respect, there was ample testimony from several employees of the dealerships that the constant, insistent and rude demands of the plaintiff upon such employees was detrimental to their work and unnecessarily interfered with the ability of the defendant to conduct his businesses. Such factors counterbalance the limited time she performed the duties of homemaker and mother.
The court, therefore, awards no interest in any of the business entities nor in the business real estate to the plaintiff. In the opinion of the court, it is problematical whether in today's business climate the dealerships can in fact survive without an infusion of funds, which obligations will be a limitation on the income producing ability of the businesses in the future. The court recognizes that the ability of the defendant to fulfill any orders entered hereunder depends on the financial success of the businesses.
 III
As to the dwelling at 39 Jaffe Terrace in Colchester, the court finds that a depreciation in value in the order of 10 percent since the date of stipulation has occurred, and finds the value (market) to be $210,000; with a current mortgage balance of $39,500. The property is jointly held, the defendant having conveyed a half-interest therein to the plaintiff previously. The remaining half-interest of the defendant therein is hereby assigned to the plaintiff. Blake v. Blake, 207 Conn. 217, 232.
 IV
As to personal property, the defendant is ordered to transfer to the plaintiff title to the vehicle she is presently using within six months of the date hereof. All of the furniture, furnishings, silver and china on the premises at 35 Jaffe Terrace whether owned separately by either party, or jointly, shall be retained by plaintiff, with the sole exceptions of the following:
(a) two large paintings by Alex Poplowski
(b) six smaller paintings by the same artist CT Page 7540
(c) one of two grandfather clocks
(d) a set of seat covers
(e) an automobile door panel
As to the issue of alimony, it is noted supra that to plaintiff, although presently not employed, had previously worked as an attorney in the legal department of an insurance company. She also testified that she had worked there part-time after the birth of the child. The court has considered these factors as well as the earning capacity of the defendant. Cf. Broderick v. Broderick, 20 Conn. App. 145, 147, citing Misiorski v. Misiorski11 Conn. App. 463. In his latest financial affidavit, the defendant shows a net weekly income of $1,418.30; however, he also shows that his business enterprises are operating at a loss of $1,568.00 per week. As noted supra, his accountant testified that he had been drawing against funds properly allocated to working capital; including a larger debt to Chrysler Credit Company. The net losses in rental income affect the ability of the dealerships to generate enough income to meet these payments.
The court finds the present earnings to be $1,418.30 per week according to his financial affidavit of February 27, 1991. See also Ex. 8, as to sources of funds.
The court finds that it would not be detrimental to the child should the plaintiff obtain part-time work, with a view to returning ultimately to full-time employment. Accordingly, the court orders the payment of alimony from the defendant to the plaintiff as follows:
 (a) until the second anniversary of this decree, the sum of $500 weekly;
 (b) until the third anniversary of this decree, the sum of $300 weekly;
 (c) until the fourth anniversary of this decree, the sum of $200 weekly.
Said sums are to be non-modifiable as to term but not amount. Markarian, v. Markarian, 2 Conn. App. 14.
 VI
The court has considered the statutory guidelines for support in this matter. The court has also considered the deviation criteria set forth in Section 17-578 (b)-4 of the Connecticut State Regulations, and in particular, the property CT Page 7541 transfer, alimony, and visitation expenses. The court enters an order of support of $150 per week, to be enforced by a contingent withholding order to Hilltop; until such child is eighteen years of age.
 VII
The court awards no counsel fees, there being no evidence of any available cash therefor. May v. May, 193 Conn. 261,269.
 VIII
The defendant shall obtain and maintain medical and dental insurance for the child until she is eighteen years of age and for the plaintiff for a period of 36 months. The standard of coverage shall be Blue Cross and Blue Shield. Medical expenses for the child not covered by insurance shall be paid one half by each. The present cost of counseling for the child shall be borne by the plaintiff. The signature of the custodial parent of the insured dependent shall constitute a valid authorization to the insurer for purposes of processing an insurance reimbursement payment to the provider of the medical services or to the custodial parent. Neither parent shall prevent or interfere with the timely processing of any insurance reimbursement claim, and if the parent receiving an insurance reimbursement payment is not the parent who is paying the bill for the services of the medical provider, the parent receiving such insurance reimbursement payment shall promptly pay to the parent paying such bill any insurance reimbursement for such services.
 IX
The defendant shall maintain his present life insurance with the child an irrevocable beneficiary until she is eighteen years old.
Each party shall be responsible for the payment of the debts set forth in their last financial affidavits and shall hold the other party harmless therefore.
Further, the defendant shall pay any sums due the Internal Revenue Service for years previous to the current year and hold the plaintiff harmless therefrom.
 XI
The defendant is ordered to pay counsel for the child any fees due him as of the date of this decree. If the amount due cannot be agreed upon, counsel may request a hearing before the court. CT Page 7542
BURNS, J.